The evidence did not demand a finding either that the homicide was justifiable or that it did not amount to an offense greater than voluntary manslaughter, as insisted. On the contrary, the verdict finding the defendant guilty of murder as charged was amply supported by the evidence, and the court did not err in overruling the motion for a new trial based upon the usual general grounds only.
Judgment affirmed. All the Justices concur, except Wyatt, J., who took no part in the consideration or decision of this case.
 No. 15987. DECEMBER 2, 1947.
J. W. Torbert, alias Tolbert, was convicted of murder, without a recommendation, in the alleged killing of Henry Peavy. His motion for a new trial, based upon the usual general grounds, was overruled, and he excepted.
The defendant made a statement, but introduced no evidence. The evidence for the State was substantially as follows:
Mary Carter testified substantially: She knew the defendant, "J. W. Torbert," and the deceased, "Mr. Henry Peavy." The deceased was killed by the defendant with a single-barrel shotgun. The deceased was not trying to hurt the defendant when the latter shot him. The defendant was in the field back of the deceased's house on the day of the shooting, fussing with the defendant's wife. The witness was in the kitchen of the deceased and could not hear the fussing. The deceased was on the back *Page 187 
porch. He told the witness to go up in the field and tell the defendant to get his damn wife and come out, he didn't want any fussing up there among Mr. Orbie's hands. The witness went up in the field and found the defendant and his wife, and they were fussing. The witness told the defendant what Mr. Peavy had said. The defendant said, "God-damn Henry Peavy. Don't tell me nothing God-damn Henry Peavy said, I will shoot your God-damn guts out." When the defendant said that, he threw his gun in the stomach of the witness, and the witness begged him not to kill her. She immediately came back to the house ahead of the defendant, and told the deceased what the defendant had said. The deceased had his gun, standing at the gate, across his arm and never placed the gun in a shooting position from the time the deceased saw the defendant until the defendant shot him. A road leads from the field, where the defendant was, by Mr. Peavy's house. The defendant came down the road to Mr. Peavy's house, and Mr. Peavy said something to the defendant when he got there. He told the defendant that, if the defendant could not come on his place without fussing, he'd rather the defendant stayed off. The deceased followed the defendant to the forks of the road telling him not to come to his place fussing. The deceased was coming back to his house when the defendant said something to him, and the deceased turned around to face the defendant and the defendant shot him, and the deceased fell there. No one but Lucy Jackson and the witness was there at the time of the shooting, other than the defendant and his wife. After the defendant shot the deceased, he reloaded his gun and ran toward the witness, who ran in the house. The witness went to the deceased after he fell and was the first person there. He was lying with his gun under him, still in his arm. The deceased was strangled with blood, and the witness turned his head where the blood could run out of his mouth. She did not see where the defendant went.
Lucy Jackson testified: She knew the defendant and the deceased, and the deceased was killed by the defendant with a shotgun. The deceased never said anything after he was shot. On the day of the homicide, the defendant came to the witness's house and nobody was at the house but the witness and her sister when the defendant came. The defendant had been at the house *Page 188 
about half an hour when his wife came, and he and his wife fussed out in the yard, and his wife hit him with a parasol. The defendant had a shotgun, and had one when he came by the house. The witness saw Mary Carter come up after the fuss had taken place. She told the defendant that Mr. Peavy said for him, the defendant, and his wife to come out from down there fussing. The defendant drew his gun on Mary Carter and told her, "No time to come up there telling him nothing Henry Peavy said, he would blow her guts out." Mary Carter said to the defendant that she had never harmed him and he said, "No," and then she turned and went back to the house of the deceased. The deceased came out of the house with his gun lying on his arm. The defendant and his wife came down there where the deceased was, and the deceased told the defendant, "Yes, I told Mary to tell you to get your wife and bring her out and not be fussing among Mr. Orbie's hands." The defendant said, "Yes sir, Mr. Peavy, I am going." The defendant kept going down the road, and Mr. Peavy was going down the road back of him talking to him, and just as Mr. Peavy turned to come back to the house the defendant called to the deceased and told him, "Mr. Peavy, you don't have a God-damn thing to do with this," and he shot him. The deceased was walking back towards the house at the time; he never said anything. After the shooting the defendant threw the shell down, jumped across the ditch, and ran to Mary Carter to kill her, and she ran back to the house. The defendant turned and jumped across the fence and ran toward his house. The deceased did not try to shoot the defendant or try to hurt him in any way. The witness showed Sheriff Taylor where the fuss took place, and also where the deceased was shot. At the time of the shooting the deceased had his gun lying on his arm.
Kinney Peterson testified: He knew the defendant and the deceased. On the day of the killing the witness was at home alone, and was going out of the door to get a bucket to take up some ashes when someone called at the front door and said, "Uncle Kinney." He recognized the voice to be that of the defendant. The defendant said, "I done killed Mr. Henry Peavy." The witness said, "Why, Jay, what did you do that for?" The defendant said, "He drove me out of the yard and made me mad." The witness said, "I am sorry it happened." The defendant *Page 189 
said, "I am too." At the time the defendant had his shotgun and did not say anything about whether the deceased tried to shoot him; the only reason he gave was "he made me mad."
W. E. Taylor testified that he was sheriff of Randolph County and knew the defendant and the deceased. "I knew where he [deceased] lived; I went out there after he was killed; they pointed out to me where he was standing when he was killed. I saw blood there at a place; the blood was in the drive, lane running from Mr. Peavy's house to the Cuthbert-Morgan public road; there was an automobile tire near where I found the blood, when I went out there, there was blood in this driveway and some one put the tire there, and the tire has been laying there ever since. . . It had been raining, the ground was wet; right on the edge of the road facing towards where the blood was, some tracks there turned towards where the blood was and an empty shotgun shell there. A few days ago I made a careful measurement; I stepped it; it was 15 steps across from where the tire is to about where those tracks were and shotgun shell that we found; about 15 yards. . . I don't know just what time I got to the scene of the supposed crime, way along in the afternoon, five or six o'clock — it was late in the afternoon. . . I examined Mr. Peavy's gun after the shooting took place, but did not find any shot marks on it. . . I found no indication of any shot marks on it whatever. . . It was raining that afternoon . . but not enough to spoil out the tracks."
Leroy Peavy testified that he was a nephew of the deceased, and corroborated the testimony of Sheriff Taylor as to the distance between the blood and the shell referred to by the sheriff. Both these witnesses testified as to routes which the defendant could have used in leaving the premises of the deceased, other than the one leading by his residence, which other routes were shorter than the one going by the deceased's house. These two witnesses in their testimony referred to a map, which appeared to have been introduced in evidence on the trial, but was not included in the brief of evidence as sent to this court.
In his statement, the defendant said he and another person had been hunting, and he came to the house where Lucy and Louise Jackson were, and thereafter the defendant's wife came. *Page 190 
After referring to a quarrel with his wife, he continued: "About that time Mary — she stays in the house with Mr. Peavy — she came running up there, she had Mr. Peavy's 32 on her hip. She came up in front of me and told me, `Mr. Peavy says you get your damn wife off his place.' I had my gun in my left hand, I says, `Don't you come up here cussing at me.' She says, `Look at Jay getting mad with me, cause I told him what Mr. Peavy said.' She told you that I cursed Mr. Peavy. I did not curse — I don't curse. I could not have run my gun in her stomach to shoot her unless I had had it with both my hands, and I was holding it in just one hand. She went back down the road crying and told Mr. Peavy a big story on me.' She told me, `God-damn you, Jay, I am going to get Mr. Peavy to swear out a warrant for you, you drawed your gun on me.' When me and my wife got to the fence, I saw Mr. Peavy and her and Lucy Jackson there. Mr. Peavy was leaning against the fence with his gun in his hand. Time I got to the fence she told him, she says, `Mr. Peavy, he drawed his gun on me.' He said, `Come on through here and get off my place and don't come on my place no more.' There was no way I could get out of there onliest I come through Mr. Peavy's yard. I came straight down the road. After I passed them, they was walking behind me, Mr. Peavy in one rut and Mary in the other. Mr. Peavy kept his gun on me, like he wanted to shoot me, but my wife was between me and him, and he was trying to dodge around her, trying to shoot me, saying `God-damn this' and `God-damn that' to me. . . When we got to the road, my wife was so weak and nervous she squatted down, and Mr. Peavy had his gun on me trying to shoot me, and he says, `You done ____ the last time.' I said, `Mr. Peavy, take your gun off me,' and I seen he was going to shoot me and I jumped from back of my wife and shot. That is the onliest way I had to come out, was that way. I come down there to talk to Mr. Peavy. The road went right through Mr. Peavy's yard. I come down there — call myself to talk with him, but I never had a chance to talk to him. I didn't draw my gun on the woman, and he would not let me say anything to him. That was not the way I wanted to come out of there, but the [way] he and that woman drove me out of there. I had to come that way, he drove me." *Page 191 
Lucy Jackson, recalled, testified: "Mr. Peavy did not point his gun at J. W. when he was going down the road; I never saw Mary Carter with a pistol when she came up there."
Mary Carter, recalled, testified: "Mr. Peavy did not point his gun at this man, his gun was laying in his arm like this; this man and his wife were walking side by side; no she wasn't walking between him and Mr. Peavy, she stood right close up side of him; no, sir, I did not have a pistol, I did not have a thing but my hands."